Gilman.
1g 269
101a ²242

ALEXANDER McDONALD, appellant, v. WILLIAM FITHIAN, et al. appellees.

### Appeal from Vermillion.

An agent cannot deal for his own advantage with the thing purchased for his principal; or become the seller, or buyer, to or of them, because of his confidential relation, and his duty to disclose to his principal every fact, circumstance or advantage in relation to the purchase, which may come to his knowledge.

Under a verbal agency, the agent cannot bind his principal in the purchase of real estate; and where one acts gratuitously in a relation of mere friendship, or instrumentality, he is not to be clothed with the character and all the responsibilities of an agent. But, even in this relation, he cannot avail himself of any information he may acquire, or of the confidence imparted, to commit a fraud upon the friend he consents to serve. All his acts must be in good faith. If the principal consent to a contract upon false and fraudulent information, materially affecting his rights, and in ignorance of the truth, he will not be bound by such consent. If fraud is proved, all the consequences should follow, whether the person acts as agent or friend, and with or without compensation for his trouble.

A refusal, on the part of an agent, to explain circumstances, which explanation, when given, does not at all vary or affect the rights of the parties, will not amount to a fraud.

BILL IN CHANCERY for relief, and injunction, &c., before the Hon. William Wilson, October term 1843. Injunction dissolved, and bill dismissed.

The original bill represents, that some time in the month of March, 1836, one Isaac R. Moores, of the county of Vermillion, as the agent of complainant, together with one James P. Murphy, as the agent of one John H. Murphy, of the said county, and one Hezekiah Cunningham, also of said county, in his own right and behalf, and also with one William Fithian, of same county, in his own right and behalf, went to Milwaukie, (W. T.) for the purpose of purchasing lands or lots in that place; and after arriving there, the said Fithian made a proposition to act for the company; that is to say, for complainant and said J. H. Murphy and H. Cunningham, as the agent to contract with and purchase from one Solomon Juneau, of the said town of Milwaukie, (W. T.) four acres

McDonald *v.* Fithian *et al.*

of land situate in said town, and suggested to said Cunning-
ham, and to the said agents of said J. H. Murphy and said
complainant, that as he, said Fithian, had had dealings with
said Juneau, he might do better than said Cunningham, and
the said agents of J. H. Murphy and said complainant could
do for themselves; and that the said Fithian engaged and pro-
mised, if the said Cunningham and the said agents would so
appoint him agent as aforesaid, that he, said Fithian, would
proceed to contract and make such terms with the said Ju-
neau as would comport with the mutual, equal, and best in-
terests of himself, (and as the agent of complainant J. H.
Murphy and Cunningham,) and of them, the said complainant,
J. H. Murphy, and Cunningham, for the said four acres.

It further states, that after hearing the said proposition and
agreements of Fithian, the said agents and Cunningham,
relying on the representations of said Fithian, and upon his
faithful and conscientious fulfilment of his said agency, con-
sented to his, said Fithian's acting as their mutual agent, and
for himself and for the common and equal benefit of himself,
this complainant and said Cunningham and J. H. Murphy, for
the purchase from said Juneau of four acres as aforesaid, and
with the express and mutually recognized agreement,and un-
derstanding on the part of the said four parties, that, after
the purchase of said four acres from said Juneau by said
Fithian, after the manner of the aforesaid proposition and as-
surances of the said Fithian, each of the said parties should
have and take one acre of said land; that is to say, that he,
the said Fithian, should have one acre, and this complainant,
J. H. Murphy, and Cunningham one acre each, and they, the
three last named, to pay one equal part or proportion of the
amount which he, said Fithian, having bargained with said
Juneau for the reciprocal advantage of the four described
parties interested, should contract and give for said lots.

This agreement being made, the said Fithian proceeded to
treat with Juneau for said four acres: the other three parties,
J. H. Murphy, Cunningham, and this complainant, taking no
part whatever in the conversation and negotiation with said
Juneau for said lots; but in conformity with the foregoing

agreement, leaving the treaty wholly to said Fithian. After said Fithian and Juneau had conversed apart from said Cunningham and the agents of said J. H. Murphy and this complainant, they came together in the presence of said Cunningham and said agents, and many others, when and where said Fithian observed as follows, or to the same effect: "Now, Mr. Juneau, say what is the least you will take for this property," meaning the said four acres; to which Juneau replied, "not one d——d cent less than three thousand dollars per acre." That then said Juneau and Fithian retired to the house of Juneau, and the next intelligence received by said Cunningham and said agent of J. H. Murphy and this complainant from said Fithian was, that the trade was made, and at *that* price; that is to say, at $3000 per acre for said land. Immediately thereafter the writings were ready, said Fithian telling said Cunningham and said agents that Juneau preferred taking his, said Fithian's notes for the whole four acres, each of the others giving their notes to him, Fithian, for one acre each; which was agreed to by said Cunningham and said agents; and J. P. Murphy was called into Juneau's house, and requested by said Fithian to witness the writings given by said Fithian to said Juneau, the said Cunningham and said agents being out of the house and seeing nothing of said writings.

The complainant also states, that by the agreement on all hands, the said trade was to be kept secret, and the terms not to be known except to those concerned; that, agreeably to the trade, as said Fithian informed said Cunningham and the agents of the complainant, and said J. H. Murphy, one fourth of the purchase money was to be paid down, and the balance to be divided into three equal payments of six, twelve, and eighteen months, making his, Fithian's, notes to Juneau $3000 each, the whole four acres amounting by the contract, as Fithian represented to said Cunningham and said agents, to the sum of $12,000; that then said Fithian required of said Cunningham and said agents to furnish him with their quota of cash payments respectively, saying that he had to pay Juneau one fourth of the twelve thousand dollars down, ac-

cording to the contract, which said Cunningham and said agents forthwith complied with, by paying each of them the sum of seven hundred and fifty dollars into the hands of said Fithian, except, perhaps, $200, which the agent of the complainant fell short of that sum, and which said Fithian agreed to advance, and wait till said agent returned to Danville, and which deficit was promptly paid to said Fithian by said agent or complainant upon their return to Danville; and except some similar deficit on the part of said J. H. Murphy and Cunningham, which was also adjusted readily, in the same way; said Fithian being very willing to supply the deficiency. Upon the return of said Fithian, Cunningham, and agents to Danville, to wit, in the month of April, 1836, this complainant, as well as said J. H. Murphy and Cunningham, executed and delivered to said Fithian, his three several bonds for the balance of the $3000, one of which he has since paid and taken up. Upon the said two other bonds made the 15th of April, 1836, one payable on or before the 4th of April, 1837, the other payable on the 4th of October, 1837, each for the sum of $750, upon which suit was instituted and judgment obtained by said Fithian, in the Vermillion Circuit Court, at the May term 1841, for the sum of $1500, and $349 damages.

The bill also alleges, that some two or three months after the purchase of the lots aforesaid, the said Fithian went to Milwaukie as he admitted; and after his return, he remarked "that he had been to Milwaukie and had settled the bond he held on Juneau, and had got of Juneau six thousand dollars, (or something upwards of that amount,) in his own notes which Juneau held on him;" that at this time, Fithian brought deeds from said Juneau for the said four acres, and was distinctly understood to say that he had paid Juneau for the four acres aforesaid with the said title bond which he, Fithian, held on Juneau at the time of the purchase of said land, and that said Fithian admitted at a subsequent period, "that he got his acre, meaning one of the four above described acres, on account of holding this same bond over him, Juneau, at the time the acres were bought:" and also at the same time, "that the bond was not named in the trade for the four acres,

but that he, Fithian, from some remark which Juneau made, understood him, Juneau, to have referred to the bond in the trade." And again, at a more recent period, "that he, said Fithian drew two sets of notes to Juneau, intending to present to J. P. Murphy as a witness the larger notes," ( which corresponded with the amount he represented to have given,) and other smaller notes, (for the amount he did give,) and which smaller notes were not intended to be exposed to view, but that through mistake, being confused, the smaller ones were presented to J. P. Murphy, which were, as he, meaning J. P. Murphy, states, for something over $2000; that said Fithian never would admit how much more than $2000 said small notes were drawn for.

The bill also alleges, that at some time since the land was purchased and after the said notes were given by this complainant and the others, the said Fithian in reply to J. P. Murphy, the witness to said notes given by Fithian to Juneau, said, "that he had made an arrangement in some way for a part, and had paid a greater portion in hand than was the bargain;" and attempted to explain how much he paid, but said J. P. Murphy could not perceive how his account could correspond with the contract and whole transaction as said Fithian had represented them.

The bill states, that the said bond which Fithian admits he gave to Juneau in exchange for the six thousand dollars "or upwards" of his notes held by Juneau, and which was in fact all said Fithian ever gave Juneau, if any thing, for the said four acres, was a title bond executed by said Juneau sometime in August, 1835, stipulating to convey to said Fithian a lot of land purchased by said Fithian of Juneau at $500. The said bond acknowledged the receipt of $10,000 of said Fithian, and contained a covenant to convey said lot under a penalty of $20,000.

The bill then charges, in the alternative, that said Fithian for the purpose of obtaining one acre of said four, for nothing, colluded with said Juneau, as the confidential agent of his own seeking, of the complainant and the other principals, and for his own gain agreed that they should pay Juneau the

enormous price of $3000 per acre for said land; and that Juneau, by said Fithian's obtaining so extraordinary a price to be paid by his principals, was to let Fithian have his acre without money and without price; that there was a well devised, well matured and well carried out fraud, conspiracy and confederation by and between the said Fithian and Juneau, to their advantage, or that, at least, of Fithian, and to the detriment and ruin of this complainant and the other purchasers; or else that said Juneau was overreached by said Fithian, and under the terror of said bond held by said Fithian, was constrained to yield to Fithian's dictation and to consent to the seeming contract and sale of said lots upon the terms, that the said sale should enure to said Fithian's exclusive benefit, with the promise on his part that he would give up to said Juneau the said bond made in 1835; that said Juneau received no part of the purchase money for said lots, and that the same and all the notes given therefor, resulted to the use, benefit and possession of said Fithian; or else that said Fithian in bad faith, did not give or contract to give said Juneau more than $9000 for the whole four acres, thereby defrauding said complainant and the other parties in making them pay for their own and his lot, also in palpable derogation of the express agreement with them.

The bill then prays that said Fithian be enjoined from proceeding further with his judgment on said bonds of complainant, and that he, Fithian, be required to refund all the money already paid by the complainant as principal and interest, and to pay interest thereon from the time the same was so paid, and for decree against him of all costs and damages, or at least that said complainant may be decreed to pay no more than is found to be his proper proportion, according to the undertaking and agency he is bound to pay, and for general relief.

The answer of Fithian admits that he was agent for complainant and others to negotiate with and purchase from Juneau the four acres, one for himself, and one for each of his principals. He states that after talking much with Juneau, he F. and Juneau came into the presence of com-

plainant and his other principals and by-standers, and he asks Juneau what is the lowest he would take per acre for said land, (notwithstanding complainant swears Juneau's price was to be kept secret and which Fithian does not deny,) and upon Juneau saying not a cent less than three thousand dollars per acre, and Juneau being gone, he F. "assured" complainant it was the lowest the land could be bought at.

He states he may have admitted he got up his six thousand dollars of notes for his title bond of 1835; that Juneau's title bond aforesaid was named at time of contract, (but not to whom named,) but that the terms of canceling were not named. He admits his acre was left open, owing to a conversation had with Juneau just as they were about to close the contract, meaning the original contract. He denies he ever told any one he was confused about being asked by J. P. Murphy to explain why the notes made by him to Juneau, which were witnessed by said J. P. Murphy, were smaller than the contract required.

He assigns as his reason for not disclosing to his principals about the old title bond, and not explaining the two sets of notes, that Juneau told him J. H. Murphy had a similar bond, and did not know the advantage he, Murphy, had over him, Juneau, and therefore Juneau requested him, Fithian, to be as silent as possible.

He says he paid twelve thousand dollars for the four acres, as follows: three thousand down, by canceling the title bond of 1836; and another payment, to wit: by deeding to Juneau lot 8, in block 6, in the town of Milwaukie.

He denies all fraud, confederacy, &c.

He alleges that J. P. Murphy was in the house, writing the title bond given by said Juneau to respondent for said four acres, during the whole time said notes were being written and prepared. He says he neither admits or denies that said trade was to be kept secret except from parties, for he does not recollect.

He admits that in two, or three, or four months, he returned to Milwaukie, and brought back deeds by Juneau for each. He went in August for deeds, and first payment not due till

October.   He denies that he did pay Juneau for the whole
four acres with the title bond of 1835, and denies he ever
said so, though he admits and says he never has denied that
he did pay for said land in part with said bond.   He says he
does not remember to have said that he got his acre of
Juneau on account of holding this same bond over him at
the time the four acres were bought.   He alleges such a
statement would be untrue, unless it be construed to mean
that he was induced to make the purchase of one acre for
himself, from the fact of holding said bond on said Juneau.

He admits that he frequently stated the terms upon which
said bond should be canceled, were not named at the time
of the purchase of said four acres.   He admits there were
two sets of notes drawn at the time of said purchase, but
denies it was done for the object stated in the bill.   He
states that the way the two sets of notes came to be drawn,
was as follows: At the time of concluding the contract for
the four acres, and he, J. insisted that this respondent should
become paymaster for the whole four acres, according to
the terms of payment, $3000 were paid down, and three notes
for three thousand dollars were written, when a conversa-
tion occurred between said Juneau and respondent, by which
it was agreed the amount to be paid for one of said acres
should be left open, and no note given for it, and to be settled
for at the time the said bond of Juneau given to respondent
in 1835, should be settled for and canceled; whereupon the
new set of notes for less amounts was drawn, and he is not
aware that he was confused when said notes were presented
to James P. Murphy to be witnessed, and he is sure he never
told any one he was so confused.   He admits that he did say
to J. P. Murphy that he had made an arrangement with
Juneau, whereby the amount of the notes were lessened; but
he denies that he ever said to him, or any one else, that he
had paid a greater portion in hand than was the bargain.
He states, that the reason why he spoke of an arrange-
ment generally, without naming the particulars, was, that it
was nothing else but the matter concerning the bond of 1835
aforesaid; that said bond was for a heavy penalty, and it was

McDonald *v.* Fithian *et al.*

wholly out of the power of said Juneau to comply with its conditions in making the deed it called for; that said Juneau had another bond out, given at the same time in 1835; and being similar in every respect to the one given to respondent, and which said Juneau could not comply with by making a deed, but the holder of which was John H. Murphy. Juneau supposed that he did not know the advantage he had of him, and he, Juneau, did not wish him, J. H. Murphy, to discover it until he could make some arrangements with him, Murphy, about it; and consequently he, Juneau, requested respondent to be as silent about his bond, Fithian's, as possible.

Respondent admits that the bond of 1835 was such as is described in the bill, but denies that it was all he paid Juneau for the four acres. He alleges he gave Juneau the whole of the $3000 down, and that he since made a payment on the said land, besides that made by the canceling of said bond.

Respondent says that he paid, and Juneau received, twelve thousand dollars for said four acres, and that he paid the same as follows, to wit: "Three thousand dollars in money, and deeded to him lot No. eight (8) in block six, (6,) in the town of Milwaukie, and gave up and canceled the bond of 1835."

Respondent further states, in relation to this bond, "that he considered it to be worth ten thousand dollars to him; and previous to the purchase of the four acres aforesaid, and to the commencement of the negotiation for the purchase of the same, said Juneau offered respondent ten thousand dollars in Milwaukie town property at its estimated value for said bond, which offer the respondent declined."

He also states that the lot of ground, as stipulated by said bond to be conveyed to this respondent, and which said stipulation, as before stated, it was out of the power of said Juneau to comply with, although it had cost respondent but five hundred dollars, was estimated at that time worth from eight to ten thousand dollars.

Juneau answers that he admits he received the title bond

in part payment, and says that Fithian paid him what they both estimated, called, and counted twelve thousand dollars for the four acres; that when they were about to sign and close the contract, and after some conversation, the precise nature of which he does not recollect, Fithian's acre was left open, he, Juneau, saying, "you do right with me by the title bond, and I will do right with you about your acre." He says he believes the others agreed that deeds should be made by Juneau, and yet he had nothing to do with complainant in closing the bargain; that defendant, Fithian, paid him down three thousand dollars, gave him the title bond for lot 8, in block 6, and canceled the title bond of 1835, and that he, Juneau, considered it (title bond) worth ten thousand dollars; that he would have been compelled to pay defendant, Fithian, ten thousand dollars, as he could not convey according to it.

Juneau denies that said Fithian paid him for the whole four acres with said title bond. He admits that he received said bond in part payment for said four acres; and he denies that said Fithian obtained his said acre from him, in consideration of his said Fithian's holding said bond against him, at the time of purchase of said four acres; but, on the contrary, he alleges said Fithian paid him what both estimated and called twelve thousand dollars for said four acres.

He admits that two sets of notes were drawn at time of purchase of said four acres, but denies that they were drawn for the object stated by complainant. He alleges the way two sets of notes came to be drawn was as follows: When the trade was concluded, it was understood that he, Juneau, was to have twelve thousand dollars for said four acres, for which he expected and insisted that said Fithian would be responsible according to the terms of the contract thereof: after the cash payment of $3000, which was made by said Fithian, three notes of three thousand dollars each were drawn up for said Fithian to sign, and when he was about to sign them, he remarked to me, that he thought I was under some obligations to let him have his acre for a less sum than the others were to 'pay, in consideration that he had paid this defendant considerable money for land previous

thereto; and after some conversation between us, the precise nature of which this defendant does not remember, this defendant replied, that he, Fithian, had been a good customer, and that he was willing to deal fairly with him, or something to that effect; and that when he, said Fithian, should make payment for the balance due on said four acres, he, this defendant, would make all things right and satisfactory with him as to the acre purchased for his own use, on condition that he, said Fithian, would do right with this defendant, canceling a certain bond he, Fithian, then held against this defendant for a lot sold by him to said Fithian in 1835, and for which it was out of the power of this defendant to make a deed the bond called for. Fithian proposed that no note should be taken for the amount of one acre, and after much conversation in relation thereto, this defendant agreed to leave open for future adjustment the amount of one acre, with the understanding that said Fithian should account to him for the said sum of $3000, when the said title bond should be arranged. Whereupon these other notes for less amounts were drawn up and signed by said Fithian, and witnessed by J. H. Murphy and A. J. Viran.

This defendant further answering admits, that the "title bond given by said Fithian to this defendant in exchange for the notes held by this defendant, of six thousand dollars against said Fithian, was the same as stated in said bill of complainant; but he denies that it was all he ever gave this defendant for the said four acres; but, on the contrary, he alleges that said Fithian paid him three thousand dollars in cash, and also gave him a bond for lot eight, in block six, in the town of Milwaukie, which bond this defendant received at two thousand dollars, and for the remainder, the said Fithian cancelled the said title bond of 1835."

He says, that said Fithian paid him in manner following, to wit: Three thousand dollars in cash, and deeded him lot eight, in block six, in the town of Milwaukie, and gave up and cancelled the said bond of 1835. In relation to this bond this defendant alleges, that he considered it worth to him at least ten thousand dollars, as it was entirely out of his

power to have complied with its conditions, and had said Fithian enforced the collection of the same, he should have been obliged to pay the sum of ten thousand dollars.

Denies fraud, conspiracy, collusion and all overreaching on part of Fithian.

William Smith's deposition. Heard purchase first spoken of after the parties returned from Milwaukie; saw a hand-bill charging Fithian with fraud; heard J. H. Murphy charge him in public, in July, 1838, saying there was some mystery about it; that his brother James said so and so.

Thomas Froman's Dep. Heard Isaac R. Moores say he had offered McDonald $500 in specie for his bargain, middle of July, 1838. Heard Fithian say he would not explain two sets of notes, if his election in 1838 depended on it. In a private talk with Fithian, he said he could not explain, on account of a certain circumstance, to wit, the title bond of 1835, given by Juneau to J. H. Murphy.

Juneau's Dep. Says Fithian would not take ten thousand dollars worth of Milwaukie property, which he offered him for title bond of 1835. He states that by the 'actual contract,' when it was concluded, Fithian was to pay him three thousand dollars down, three in six, three in twelve, and three in eighteen months, that F. completed on the 14th of August 1836. The amount was what we both estimated, called and counted twelve thousand dollars; says lot sold to Fithian in 1835, at time of canceling title bond was worth from eight to ten thousand dollars; that on 1st or 2nd day of April, 1836, (which was a day or two before Fithian bought the four acres,) he tried to get up bond of 1835, offered F. ten thousand dollars worth of Milwaukie property, which Fithian declined. He says, on 4th of April he sold the four acres, and Fithian paid him three thousand dollars down, and paid him remaining nine thousand on 12th August, 1836, by giving a title bond for lot eight, in block six, (the lot Fithian held, Juneau's title bond for, of 1835,) or in lieu of making a deed for said lot, it was stipulated in said title bond, that Fithian should pay me two thousand dollars in cash, and which I received, as two thousand in part payment of certain notes I

then held against him, amounting to $6000, and the balance of the notes. I still held against him, together with three thousand dollars he owed me towards the price of said four acres, and for which said last sum no note had been given at the time he purchased said acres, was then paid in a bond he held on me, in which bond I had acknowledged to have received ten thousand dollars in payment for a certain lot I had sold him in 1835, and for which it was out of my power to make him a deed.

He says that Fithian gave his notes for six thousand dollars precisely, while Fithian says upwards of six thousand. He says further, "the main reason why I preferred taking Fithian's notes was, he held the ten thousand dollar title bond, and if I had to pay the ten thousand dollars, the notes would do no harm." He says he intended to make a deduction, if Fithian would do right with the title bond, and yet, in a former answer, he considered Fithian as much indebted for the acre of Fithian, as if he had given his note, but that Fithian did not ask any deduction, and none was made.

He states that when depositions were to be taken in this cause, Fithian went to the neighborhood of Milwaukie, and sent for him, Juneau; told Juneau he wanted him to think over it, and that Walker would be out; that Fithian read the questions but did not threaten; that Juneau and Poff gave their depositions from written answers.

He says that he sold J. H. Murphy his lot in 1835, adjoining Fithian's lot, at five hundred dollars, but upon urgent solicitation of said Fithian and Murphy. He says they, Murphy and Fithian, were both present when he gave them title bonds in 1835, and that the bonds were alike, except the number of lot.

He says that he made an attempt to get up bond of 1835, on 1st or 2nd of April, 1836, offering Fithian ten thousand dollars in Milwaukie town property which he refused; and that he expected to have to pay him ten thousand dollars in some way for the bond.

He further says, that by the " actual contract, Fithian was to pay me $3000 per acre:" again, by the actual contract,

when the bargain was concluded, Fithian was to pay me $3000 down, $3000 in six, $3000 in twelve, and $3000 in eighteen months; "that Fithian was about to sign said notes for $3000 each, when he, Fithian, stopped, and remarked that he thought I was too tight, or tough, with him; that he had been the purchaser of a good deal of property heretofore from me, for which he had paid considerable sums of money, and yet I made him pay just as high for his acre as I did the others; that he thought I ought to deal more liberally with him than with persons who never had bought of me, or been my customers heretofore in the purchase of town property, or words to the same purpose."

"I replied, that the land was worth more than three thousand dollars an acre; that I was certainly giving him a good bargain; but that as he had heretofore been a good customer, when he should come to make payment of the balance due on said four acres, I would make all things satisfactory with him as to the acre he was purchasing for his own use and benefit, provided he would do right with me in cancelling a bond he then held on me, for the lot I had sold him in 1835, and for which it was out of my power to make the deed it called for. He said he would do right in canceling said bond."

"Fithian then proposed that no note should be taken for the amount of one acre. He insisted that as I could not make him a deed for the lot he had purchased in 1835, and for which lot he had paid me cash, I ought to be as willing to trust him as he was me. I then willingly agreed to leave the matter open, and take no note for the sum of three thousand dollars, the price of one acre, with the understanding that said Fithian should account to me, and settle for said sum at the time we should arrange the ten thousand dollar bond said Fithian held on me, for the lot I had sold him in 1835. Thereupon three notes for less amounts were written and signed by said Fithian, and witnessed by J. P. Murphy and A. J. Viran."

"The amount said Fithian then executed his notes to me for, was six thousand dollars. J. P. Murphy was in my house, writing the title bond I gave to said F. for the conveyance

of said four acres, during the time said notes were being written, and was requested to witness, and did witness said bond and notes.''

He says that he was more particularly induced to make the request that Fithian should be as silent as possible about his title bond, because J. H. Murphy held a bond of the very same nature, and Murphy did not then know that he, Juneau, could not make a deed according to it, and from the fact that one of the acres Fithian was then purchasing of him, he, Fithian, said was intended for J. H. Murphy.

He says that Fithian paid him $9000 on the 12th August, 1836. He states that Fithian said he was only acting, in the purchase of the three acres intended for McDonald, Cunningham and Murphy, as their neighbor and friend; that he asked them nothing for his services, &c.

He states that Fithian paid the $3000 cash, and he took Fithian's notes for six thousand dollars of the balance, in three payments of six, twelve and eighteen months, and his promise, without note, for three thousand dollars, to be paid when we should cancel a certain bond he held on me.

" Fithian paid $9000, in a lot in the town of Milwaukie, and a bond he held on me."

He says, " I finally redeemed said bond, in a settlement with Fithian for the four acres of land he had purchased of me, in 1836. The amount I paid said Fithian for said bond, was seven thousand dollars. I think I paid him no money. I gave him his notes, amounting to six thousand dollars, and three thousand I held against him, for which I held no note, for said bond, and a lot he had in Milwaukie. The lot we valued at two thousand dollars."

Cunningham's deposition: In latter part of March 1836, after being a few days in Milwaukie, Fithian proposed to act as agent, and would see J. P. Murphy and Moores, and they were all to have it at the same he got it at.

Fithian admitted in 1838, there were two sets of notes, which he had always felt bad about. Fithian admitted he had made a good trade with Juneau; got six thousand dollars for his bond, or upwards; that Fithian said in 1838, he felt

bad, and would explain some time or other. He denies posi-
tively knowing the circumstances of the title bond, two sets
of notes, &c. when he took the deed from Fithian. Fithian
told him first, himself, in 1838, when Fithian had Juneau's
certificate, that he, Juneau, had got what he considered
twelve thousand dollars.

He told us we must not say any thing to Juneau about
trading; that he would go and make the trade, and we should
have it exactly the way he got it from Juneau.

Fithian then went to see Juneau; he was gone some time,
and he and Juneau came in the presence of us and a good
many others, and he, and Juneau, and we, and a good many
others, walked down to look at the land, and he, Fithian, asked
Juneau, in presence of all the company, if three thousand
dollars per acre was the lowest he would take for the four
acres? Juneau replied; "Not one damn'd cent less than
three thousand dollars!" Then Juneau went, or returned, to
the house, and Fithian with him, or a few minutes after. In
the next conversation, he told us he could not get the land
for less than $3000.

At the time Fithian brought deeds from Juneau for said
lots, I knew nothing of the circumstances relied on in this
case for obtaining perpetual injunctions to defendants' judg-
ments.

Fithian first told me there were two sets of notes, (1838,)
and showed Juneau's affidavit, in which he states, that in
settling up the whole matter, he, Juneau, got what he esti-
mated at twelve thousand dollars.

Richard T. Leveuichs' deposition: States he was a clerk
in Fithian's store in March and April, 1836; that Fithian
went to Milwaukie that spring, with the avowed intention to
purchase lots in Milwaukie; that he started in company with
Hezekiah Cunningham, James P. Murphy and Isaac R.
Moores; presumes the amount of money Fithian took with
him was not far from three thousand dollars, so far as his
knowledge extends; thinks the amount he brought home
would not vary much from $2500; thinks he heard Fithian
say, shortly after he returned from Milwaukie, that he had

purchased four acres of land there, three of which were intended for McDonald, Cunningham and Murphy, and the other for himself, and that he had given his own notes for the four acres purchased of Sol. Juneau, and that he acted for the others in the purchase of said land, at the time they gave him their notes for the same, and at various times since; thinks he has heard Fithian say there were two sets of notes drawn at the time, but for what purpose does not know.

The following is the substance of the depositions:—J. P. Murphy's deposition.—States that he was agent for J. H. Murphy, for the purchase of one acre; that Fithian spoke to him to appoint him, Fithian, agent to deal with Juneau, saying that he had dealings with Juneau, and he could do better for all than we could; that he, Fithian, had spoken to Moores and Cunningham, and they were willing; that he, J. P. Murphy, agreed to it. He says he knew nothing of the trade, except Fithian asking Juneau how much he would take, &c., and Fithian's returning in a short time, and saying the trade was made; he further states, that, in the evening, after they left Milwaukie, he spoke to Fithian about the notes he, Murphy, witnessed, being smaller than the contract; he, Fithian, said they were over two thousand dollars; that he, Fithian, paid a greater amount down than the bargain; Fithian said nothing about the title bond; thinks Cunningham rated the lands at six, seven, or eight thousand dollars per acre, before the 4th of April, 1836; he rated them more than three thousand, he thinks at six thousand; states that the negotiation for the four acres was not conducted in the presence of all the parties, except Fithian's asking Juneau in our presence what was the least he would take; that it was, perhaps, about half an hour after the said question was asked by Fithian; Juneau immediately returned to his store, and Fithian staid, and consulted with us a short time as to the propriety of giving the price asked; after the consultation, Fithian went to Juneau, and in a short time he informed us that the trade was made.

Deponent thinks he paid six hundred dollars; the others fell short of paying the amount of the advance payment, but can not say how much. Fithian was to pay Juneau the amount of

McDonald *v.* Fithian *et al.*

the advance payment, and to receive the balance of each one's proportion of the same from them at Danville; the money was not paid in the presence of Juneau. Fithian told him, on coming from Milwaukie, that he paid a greater proportion down than we did, and also stated the amount which he paid down; but how much, don't recollect. He said nothing about title bond; says Fithian told them Juneau preferred taking his notes, and that was the reason why we agreed to it. He states the reason he thought Fithian was practising a fraud on 4th of April, 1836, was, that the notes he witnessed were smaller than they should be, and the circumstance of Fithian asking Juneau, in presence of company, what was the least he would take, and I told Moores and Cunningham I believed there was something wrong about it. Fithian told us $3000 was the lowest it could be bought at.

James P. Murphy's deposition continued: Question by defendant. Was you, or not, writing the title bond given by Solomon Juneau to said Fithian, and at the same desk; if so, were not said bond and notes signed, and witnessed by you, at the same time? Ans. I think I was writing the title bond at the same time the notes were preparing, and that I witnessed the bond and notes at the same time. Cannot say positively whether I wrote the bond at the same desk at which the notes were written or not, but did in the same room; do not recollect what Juneau said the lot Fithian purchased of him in 1835, was worth. I heard him rate it very high. I knew they were rating lots, situated where it was, very high, from six to eight thousand dollars, at the time we were there in 1836.

Isaac R. Moores' deposition: States some days after we got to Milwaukie, Fithian observed he had had dealings with Juneau, and he could do better, &c., than we could, and we all agreed for him to act as agent. He was to get it at the lowest price he could. Fithian and Juneau stepped off together, after Juneau said three thousand dollars per acre was the lowest he would take, and in a short time he told us that the trade was made.

Juneau told me, when I went to Milwaukie, some time after, that Fithian paid $3000 per acre, except his own acre, which he did not tell me the price of. Knows nothing of conversation about going to Milwaukie "to speculate." I did, rate the land considerably more than $3000 per acre. I purchased at $2000. I think there was no general price. On our way home from Milwaukie, J. P. Murphy told me he thought there was something wrong, as he saw the notes and amount did not agree; he seemed to talk as if he thought there was some fraud in it. I replied that I did not think it could be possible. The reason I did not inform McDonald, before he executed his notes to Fithian, of the suspicions of J. P. Murphy, was, that I did not believe, at the time, it was the fact.

In 1838, the reason for believing there was something wrong, was first, the statement of J. P. Murphy, that the amount of notes which he witnessed did not agree with the amount that was to be paid; and next, that we, Cunningham, McDonald, and myself went to Fithian's house, and brought the subject up, and Fithian stated that he had given three thousand dollars an acre for three acres for Murphy, Cunningham, and McDonald, but for his own acre, he did not give $3000, in consequence of a bond he held previously on Juneau, he got his acre for less than $3000, and that he would make that all right with the company. We told him that would not do; we wanted him to state precisely what he gave for the four acres, which he refused to do. In addition to that, the statement he made to J. H. Murphy, Cunningham and McDonald, that there were two sets of notes drawn; and that he had always felt bad about it, as they told me. The object in going to Fithian, was to get the matter settled, without going into the church, or to law.

We appointed Fithian, as agent, to make the trade for the four acres, at the best price he could get it for; one acre for himself, one for Cunningham, one for Murphy, and one for McDonald, and we did not appoint him an agent to buy one single acre for himself, as one that did not belong to the company. My impression is, that the four acres were to be bought

jointly, and that each one was to have an equal, undivided acre.

G. W. Casseday's deposition: When they were all returning from Milwaukie, he heard Fithian say that each paid, or was to pay, proportionable parts of $12,000. Fithian since told him, that he, Fithian, got up $6000 of his notes for title bond, &c. Fithian told him that he urged and pressed Juneau to convey, and Juneau could not, and Juneau insisted that Fithian should take the lot as it was, although smaller than described in title bond given by Juneau. Fithian then asked him, Juneau, how much the lot was worth, and Juneau answered "about $6000," and he, Fithian, then remarked to him, Juneau, "you hold my notes for $6000; give me the notes, and I will give you up the bond; he, Fithian, said Juneau did so."

L. T. Palmer's deposition: Heard Fithian say that he had made sixteen thousand dollars that year, 1836, in speculating.

Juneau paid, in the spring of 1835, ten dollars a piece for the two lots he sold in August, 1835, to J. H. Murphy and Fithian for five hundred dollars a piece.

Fithian paid, in the spring of 1836, five hundred dollars for the lot bought of Juneau in 1835.

*J. J. Brown*, and *J. McRoberts*, for the appellant, relied on the *following points* and authorities:

Whenever a fair, reasonable, judical doubt exists, whether a party has not availed himself of the opportunities of a confidential situation, in order to obtain some selfish advantage, it would be too dangerous, considering the relation between the parties, to allow a transaction of that suspicious nature to stand. Hovenden on Frauds, 145.

As to agency, *Lady Ormond* v. *Hutchinson*, 16 Vesey, 107; in such case the cestui que trust may set aside the contract, at his option without proof of fraud. It cannot be suffered, that an agent should contract clandestinely, setting up a nominal vendee, and dealing with his own employers, in the name of that person; the employers are thus thrown off their guard; they are led to suppose they have an agent acting solely with

McDonald *v.* Fithian *et al.*

a, view to their interest, endeavoring to get the best price for them, while in fact the agent is contracting with himself, and fixing the price which he is himself to pay. To call this a contract, indeed, would be an abuse of terms; it is in equity a mere nullity. To a contract, there must be two parties. Lord Thurlow seems even to have been clearly of opinion, that a person employed to sell, could not under any circumstances, possibly be permitted to buy; that the principle must prevail even if he bought fairly; and that such a purchase could not be supported, although it was made with the knowledge of the party selling. And as an agent cannot, at any rate, purchase from his employer, except under the restrictions above specified, so it would be equally opening a door to "monstrous fraud," to use Lord Rosslyn's strongly expressive language, if an agent were allowed to be himself the seller of articles, which he was employed to procure for his principal. The clearest evidence of consent would be necessary to support such a transaction." Hovenden on Frauds, 145.

. Is it not plainly inferable from Fithian's whole conduct, and all the evidence, that although he was nominally as agent the buyer of the lots, he was in fact the real vendor to his principals, for the obvious, though hidden, object of disposing of his title bond of 1835, which Juneau admits he could not pay and getting his neighbor's bonds in lieu thereof; and therefore, he was the beneficial vendor to his principals, instead of the purchaser as agent for them, from Juneau?

These are uncontroverted principles. Agent must conceal nothing which could have any influence upon the judgment of the principal as to the price and value; the proof lies on the agent to show that every thing is fair; agent cannot buy, even if the transaction be perfectly fair; the contract is void by reason of the relation of the parties. 2 Story's Eq. Jur. 506; 4 Equity Reports, 682.

It is of the most imperious obligation to prove transaction fair in all its parts; must show by the clearest and strongest proof, the purity of the transaction; that this Court will lay hold of the slightest circumstance to prevent a fraud." 2 Har. & Johns. 292.

McDonald *v.* Fithian *et al.*

There is a remarkable incongruity in the case, as made out by Fithian and Juneau in this: Fithian, on first or second, April, 1836, would not take ten thousand dollars worth of Milwaukie property for the title bond of 1835, and still on the fourth of same month and year, he makes a bargain for four acres of Milwaukie property at twelve thousand dollars. The great effort to show there was no reduction on Fithian's acre, and again the labored exertion both make, to show the great value of the lot in the title bond of 1835; that Juneau thought it worth ten thousand, and offered Fithian only two days before, ten thousand dollars of Milwaukie property for it. Fithian bought the four acres, and both show that Fithian gave up same bond, and, which is perfectly ridiculous, gave Juneau a title bond for same lot for Fithian's six thousand dollars in notes, and in lieu of two thousand dollars, making eight thousand dollars, added to the three thousand in cash, making in all, eleven thousand dollars Fithian paid for the four acres, and leaving one thousand dollars unaccounted for. *Falsum in uno, falsum in omnibus.*

Lord Harcourt and Lord Hardwicke declare, that, although at law fraud must be proved, yet in this Court (of Equity) it will be presumed; and on this principle has this Court ever since acted. In this case, it is not only to be presumed, but has been proved. It is also laid down in many of the books that this Court will lay hold of almost any circumstance to prevent a fraud, so odious is every approach of such conduct received here. 1 Equity Reports, 300-1.

Either *suppressio veri*, or *suggestio falsi*, is each a good reason to set aside any deed or conveyance. In this case, both of these reasons strongly apply; for here there is a *suppressio veri*, in the defendant's attempting to conceal the purpose for which he engaged in the purchase of the four acres, to wit: to turn his title bond to profitable account. There is also a *suggestio falsi*, because he represented to his principals that he was to pay $3000 in cash and give his notes for $9000. 14 Vesey, 214, 224, 243, 91, 110.

It is laid down as a universal maxim in *Legard v. Hodges*, 1 Vesey, junr. by Lord Chancellor Thurlow, that whenever persons agree concerning any particular subject, that, in a

Court of Equity, raises a trust as against the party himself, and any claiming under him voluntarily, or without notice.

An agent cannot be permitted to be the buyer and the seller, even if the sale had been perfectly fair. 3 Bro. C. C. 117; 4 Equity Reports, 703.

To effectuate such transactions at all an agent must have divested himself of the character of agent, and he must prove the utmost fair dealing. 9 Vesey, 234, 244; 10 Vesey, 385.

An agent to sell shall not convert himself into a purchaser, (and of course *e converso,*) unless he can make it perfectly clear, that he furnished his principal with all the knowledge he possessed. Lord Erskine, 13 Vesey, 95.

Deeds set aside by Lord Eldon and Erskine upon the circumstances under which they were obtained, and the confidential relation of the person by whom obtained. *Purcell v. McNamara,* 14 Vesey, 107.

If the bonds, or deeds, of complainant can be held binding under any circumstances, however fair, it is incumbent on him to show demonstratively, that he had not abused the trust reposed in him; that he had given all *possible information* to his employers. Instead of this, the new contract was made whilst the agency subsisted. 4 Equity Reports, 705.

It was insisted by the defendant below, that whatever may have been the character of the original transaction, the acts of confirmation and acquiescence by the complainant, bound him completely.

In *Beaumont* v. *Boultbee,* 5 Vesey, 485, the chancellor relieved of the many years' delay, in the case of an agent, in whom confidence had been placed; stating that though lapse of time might be a good objection for others, it was not so for one so situated, and Lord Eldon affirmed this decree on a rehearing. S. C. 7 Vesey, 599.

All the acts of confirmation, as relied on, were done before complainant knew in 1838, the evidence of fraud.

The doctrine of confirmation is settled, that the party who gives them, must be shown to be no longer under circumstances of blind confidence, which led into the first agreement; and that he is aware he is not bound by the original contract, but may be released from it; but that, nevertheless,

he chooses deliberately, and without imposition, to confirm what he did first. To this it must be added, that in many cases, particularly of great abuses of confidence, confirmations are not allowed to have any effect.

4 Equity Reports, 709; 1 Vern. 237, 439; 2 do. 121; 2 Vesey jun. 281-2; 2 Bro. P. C. 183; *Baugh* v. *Price*, 3 Wilson's Reports; 2 Atk. 25; 2 Bro. C. C. 400; 2 do. 117, 118; 1 Vesey jr. 220; 3 Bro. C. C. 633; 14 Vesey, 214; 2 Schoales and Lefroy, 474.

If an agent is allowed to become the purchaser at all, under any circumstances, from the *cestui que* use, it is of the most imperious obligation on him, to show that the purchase was *perfectly fair in all respects*, and is not liable to any sort of objection. 4 Equity Reports, 716.

For a summary of authorities on the whole doctrine of this case, see Principal and Agent by Theobald and Hammond, 362. See 6 Vesey, 625; 8 do. 337; 10 do. 385; 13 do. 355; 3 Binney, 54; 4 do. 43; 5 Johns. 43.

The various decisions touching this subject collected in 2 Johns. Ch. R. 257, in the case of *Davoue* v. *Fanning.*

The Opinion of the Court was delivered by

SCATES, J. This case comes upon appeal from the Vermillion Circuit Court, dissolving an injunction, and dismissing complainant's bill. The record is too voluminous to give any more than will present the points raised; and advert to such portions of the testimony as, in our opinion, establish material facts.

The history of the transaction appears to be as follows: Some time in the year 1835, Fithian purchased a lot in Milwaukie, Wisconsin Territory, for the sum of $500, of the defendant, Juneau. Juneau executed a title bond, in which he acknowledged the receipt of $10,000, conditioned to convey, under a penalty of $20,000. The same year, he sold another lot to J. H. Murphy, and gave him a similar bond. In the spring of 1836, Juneau found that he was unable to convey a title to either of them, of which fact Fithian was apprised; but it does not appear that Murphy knew that fact; Juneau, at least, believed he did not.

In March, 1836, Fithian and Hezekiah Cunningham, for themselves, and Isaac R. Moores, as the agent of complainant, and James P. Murphy, as the agent of John H. Murphy, went in company from Danville, Illinois, to Milwaukie, for the purpose of speculating in land, or town lots; the two former, separately and individually for themselves, the two latter, separately and individually for their respective principals. A conversation occurring at Milwaukie relative to their common object to speculate, it was suggested by Fithian to the company, or by some of the company, that, as he had dealt some with Juneau in town property, possibly he could make better terms with him than any of the rest, and by all purchasing together, a better bargain could be had than by each one buying separately. All being of that opinion, it was agreed that Fithian should contract for four acres of Juneau, and that each one should take his separate acre. Accordingly, Fithian treated with Juneau about the purchase, and Juneau proposed that $3000 per acre was the least he would take. This was made known by Juneau and Fithian to the others, and after consultation together, apart from Juneau, they each agreed to take an acre at that price, one fourth in hand, and the remainder in three equal payments at six, twelve and eighteen months. Juneau insisted to Fithian, as he communicated to the others, that he should give his individual notes for the remainder, and take the notes of the others to himself. To this, all agreed. The money was paid by each, except a small sum advanced by Fithian for complainant and John H. Murphy, which they afterwards reimbursed. Fithian executed his notes to Juneau for $6000, and took a bond for title to himself. Three thousand were left unadjusted by note until Juneau should adjust the bond for title, which he gave Fithian in 1835. But this fact was not made known to the others, Juneau requesting Fithian to be as silent as possible about the fact that he was unable to make those titles, until he could get some compromise with Murphy on his bond, believing that Murphy was not aware of his inability to make the title, and of the advantage he possessed.

Upon the return of the parties to Danville, and Moores, complainant's agent making known to him what had been done, he executed his notes to Fithian for the residue of his acre at six, twelve and eighteen months, taking a bond from Fithian for a title, but which Fithian has since taken up, upon Juneau's conveying the acre directly to complainant. Complainant has since paid one of the notes to Fithian, and upon the other two judgment has been rendered against him, which judgment he seeks, by this bill, perpetually to enjoin. He charges in his bill that Fithian, at his own suggestion of its advantages, and at his own proposition and solicitation, was appointed by the parties their agent to negotiate the purchase, and that he undertook to do the best he could, and make such terms with Juneau as would comport with the mutual, equal and best interests of each and all; and that after the agreement upon the price, each one should have, and take his separate acre.

The bill further charges that Fithian and Juneau combined and confederated to cheat and defraud the complainant and the others; that, in consideration that Juneau would let him have one acre for the title bond of 1835, he agreed that the others should give $3000 per acre, or that Fithian overreached Juneau in consequence of holding said bond. And the bill avers that Fithian afterwards, in pursuance of such agreement, paid the remaining $9000 with the said title bond of 1835. The bill prays that Fithian refund to complainant all that he has paid, or, at least, that he be perpetually enjoined from the collection of any more on the judgment.

Fithian and Juneau answer separately, admitting all the facts in relation to the purchase, &c. &c., but deny all fraud, combination, and overreaching; and also all the material facts charged and stated in the bill, tending to show or prove fraud. They state that the land was worth, then, the price paid, and purchased at the lowest sum that Juneau would take; and that Fithian paid $3000 down in cash, and for the remainder, he gave the title bond of 1835, and a deed to Juneau for lot eight (8), in block six (6), in Milwaukie.

There are eight errors assigned which, in substance, ques-

tion the decree dissolving the injunction, and dismissing the bill upon the proof in the case.

The depositions are too voluminous to attempt to set them forth in detail. I will, therefore, only advert to the prominent facts tending to impeach, and sustain this transaction, on the grounds of bad faith, and fraud. The answer admits that Fithian acted, in negotiating for the land, under a verbal agency, and although denied, it is proved that he made the first proposition to that effect. It is contended, that being the agent, he could not deal for his own advantage with the thing purchased for his principals, or become the seller, or buyer, to or of them, on account of his confidential relation, and being bound to disclose to them every fact, circumstance and advantage, in relation to the purchase, which may come to his knowledge. These general principles, I recognise as correct. It is contended, on the other side, that a verbal agency in relation to land, is not binding; that Fithian could not have bound his principals; that he was not the agent of the parties to make a purchase; but, as a mere friend, an instrument, or go-between, to make and receive propositions for a purchase and upon which the others had to act, and did act, before any contract was concluded.

I admit that, under this agency, he could not have bound his principals, and that where one acts gratuitously, in a relation of mere friendship, or instrumentality, he is not to be clothed with the character and all the responsibilities of an agent. But while I would thus protect him, I would, by no means, permit him to avail himself of any information he might thus acquire, or of this confidence, to commit a fraud upon the friend he consents to serve. Fraud is odious, and will not be tolerated under the guise of friendship, or gratuitous service. If he consent to act in the relation of mere friendship, so far as he acts he must do so in good faith. He shall not commit a fraud, and ask it to be sanctioned because that, from the manner of his appointment, he could not have bound his principal. Nor will it avail, in this case, any thing, that the principals consented to, and concluded the contract themselves, if they did so upon false and fraudulent information,

materially affecting their rights and in ignorance of the truth. For the question is not one of validity of a contract, depending upon the legality of an agency, nor of gross negligence in the execution of a voluntary service; but it is one of positive fraud, and I am of opinion, that if proven, all the consequences should follow, whether as agent, or friend, and with or without compensation for the trouble.

Having disposed of this branch of the subject, I come now to consider and examine the evidence of fraud. The ground of the fraud is supposed to be, that Fithian did not agree to give three thousand dollars per acre, and to be paid in money, as he represented to complainant and the others; but that the contract was for a less sum, and in whole or in part, to be paid in the title bond of 1835; or that he was to have his acre for less, in consideration that he, Fithian, would procure the others to pay that sum. The evidence is circumstantial, consisting of facts and detached portions of conversations with, and admissions of Fithian. At the time the contract was concluded, and about to be executed, James P. Murphy and Fithian were in Juneau's house with him. While Murphy was writing a bond for a title from Juneau to Fithian, the notes for the remainder of the purchase money were drawn in the same room; that there were two sets of them prepared, one for $9000 according to what Fithian had represented was the price, and another set for six thousand; and that the smaller set were executed, and witnessed by Murphy, as well as the bond, and for what reason, was not then explained to Murphy, for he heard no conversation at the time between Fithian and Juneau on the subject. That Fithian looked confused when the larger notes were presented through mistake. On Murphy's afterwards alluding to the fact, and asking the reason why the notes were for less, Fithian said he had paid more down. In 1838, Fithian was a candidate, and was charged with fraud in the matter by John H. Murphy, and in a handbill, when Fithian said he would not explain the two sets of notes, if his election depended on it. In a private conversation, he said it was on account of the title bond given t Murphy by Juneau, that he would not explain. He admit-

ted that he felt bad about it, and would explain some time or other.

After Fithian and Juneau had conversed apart, they came together into the presence of the other three, and divers others, when Fithian asked Juneau what was the least he would take per acre, and Juneau replied, not one cent less than $3000 per acre. This was all the others heard pass between them on the subject.

Fithian afterwards admitted to complainant, Cunningham and Moores, that he did not give three thousand for his acre, in consequence of the title bond of 1835, which he held on Juneau. This is stated by Moores in his deposition, and further, by him, Fithian said he would make it all right. Fithian was known to take about $3000 when he went to Milwaukie, and return with about $2500. Fithian was heard to say, that he had made about $16,000, speculating in 1836.

A day or two before the acres were purchased, Fithian had been offered by Juneau, and refused $10,000 in Milwaukie lots for the title bond of 1835. Afterwards, in August 1836, when he finally settled with Juneau, for the four acres, this bond was rated, as Fithian states, at $6000, and Juneau states at $7000, in payment of the remaining $9000, and a deed to lot eight, (8,) block six, (6,) at $2000 or $3000.

The defendant took Juneau's deposition, and from it, it appears, that a few days before the deposition was to be taken, Fithian went into the neighborhood of Milwaukie, and sent for Juneau, read to him the interrogatories that were to be put, and requested him to think over it.

These are the principal facts and circumstances relied upon as establishing the fraud.

The explanation of these circumstances given in the answers of Juneau and Fithian, and the deposition of Juneau, is this: About the time Fithian was going to sign the notes, he insisted that Juneau should let him have his acre for less, as he had been a good customer; or at least, that the price of it should be left open, and no note taken until the title bond of 1835 was adjusted, to which Juneau agreed. Ac-

cordingly another set of notes was drawn for a smaller amount; and that Fithian and Juneau both believed that Juneau was liable for $10,000 on the bond of 1835; and so, upon settling in 1836, they compromised the bond at $6000 or $7000; and for the balance, Fithian made Juneau a deed for the lot eight, (8,) in block six, (6,) which was counted and believed to be good for the remainder of the $12,000.

The reason why he would not explain the two sets of notes, and state how much, and in what he paid the remainder, was, because Juneau desired him to say nothing about the bond, and his inability to make a title, as he was liable to Murphy on a similar bond, for the same amount; and Juneau wished to get a compromise with Murphy before he found out his want of title. He could not, therefore, explain his own transaction, without apprising Murphy of his advantage. It is further shown in evidence, that the lot for which that bond was given, was then rated at from $8000 to $10,000; that the land sold to complainants and others was then rated at and thought to be worth $3000 per acre; that complainant was offered $500 for his bargain by Moores, his agent; and that Fithian afterwards sold his acre for $6000; and the other acres were thought to be worth more than was paid for them. There was then a great rage for Milwaukie lots, and holders hardly knew what price to set upon them, for fear they would not ask enough.

The agency of Fithian in this transaction, it seems to me, extended only to the negotiation and settlement of terms with Juneau for this purchase; and as to the price, kind and time of payment, if, in the business of his trust, he committed a fraud, I have said he should account for it. These terms were fully and fairly made known to the others, and they consented. This is positively asserted in the answer, and not contradicted in the proofs. The proposition to execute the bond for title to Fithian, and take his notes, was also submitted to them, and agreed to. The answers both positively deny that any change was thereupon made, in the time, amount, or kind of payment, and only that a note should not be given for $3000 of the purchase money. Now is this true,

and if not, does it affect the rights or interests of the complainant, or the others, in relation to any matter confided to Fithian?  Fithian and Juneau alluded to the adjustment of the bond of 1835, when Fithian should come to settle the remainder of the purchase money; and this seems to be the basis of the fraud, showing, as is contended, that he did not agree to give so much as $12,000; or that he did not pay $3000 down; that he was to have his own acre for nothing, and had changed the terms of the contract, without apprising his principals.

The complainant seems to proceed upon the idea, that he would have had a right to see to the adjustment of the amount Fithian was entitled to receive on the title bond of 1835; that, because Fithian gave only $500 for the lot, he would not be entitled to receive of Juneau so much as $10,000; and if, in law, Juneau would not be liable to pay so much, he would have no right to pay it, nor Fithian to receive it. These would, indeed, seem to be the positions assumed. Else, what change would it effect in the contract, if Juneau should first settle that debt, by paying Fithian $10,000, and then receive back $9000 in discharge of this debt?  If, indeed, the adjustment of that debt was a consideration for giving more for these acres, it would, no doubt, be fraudulent. But to draw this conclusion from the simple fact, seems to me to be begging the question, by assuming the conclusion, as the means of proving it.  It does not appear that Juneau was insolvent, or in doubtful circumstances; or that the debt was insecure.  It does not appear that $10,000 was more than was legally recoverable upon the bond.  The true recovery would have been the value of the lot, at the time stipulated in the bond to convey it.  When it was to have been conveyed, does not appear; but it is in proof that the lot was rated at, and considered to be worth from 8 to $10,000, in April, 1836.  There is nothing in the record showing that Fithian and Juneau estimated the debt due on this bond larger than its true legal amount.  If, then, this debt was really due, and Juneau was able to pay it, of what advantage was it to Fithian to pay with it, debts that would become due in six,

twelve, and eighteen months? It amounted only to the adjustment of a claim upon one man, by taking claims upon three others, and all equally good and solvent, for any thing appearing.

Again, because he did actually settle the purchase money with this bond, it seems to be regarded as evidence that it was a part of the contract, in the first place, that it should be so settled. Suppose it was the contract, would a knowledge of that fact have bettered the condition of the complainant? It was still cash. He would have no right to say to Fithian, that his bond for the title was not cash. It had, at least, become a cash demand. He might as well have denied Juneau the right to settle any other cash demands upon him with the proceeds of this sale, as to deny this one due Fithian.

But there is another circumstance, that seems to weigh much with the complainant. Fithian gave contradictory accounts of there being two sets of notes, and refused to explain. This, to me, is fully and satisfactorily explained. Juneau had requested silence in relation to the bond, because Murphy held a similar one; the amount acknowledged in it to have been received, was $10,000, the 'penalty $20,000, although the actual purchase money was but $500. Juneau sought to settle it on the best terms he could. To explain, would be to apprise Murphy, and a breach of confidence with Juneau. Neither the adjustment, nor any transaction arising out of, or concerning this bond of Murphy, was committed to Fithian; nor does it appear that the discovery of Juneau's inability to make a title was any way connected with his agency in this new negotiation. I can see no want of good faith in letting alone a business not confided to his management. Murphy had his agent there, no doubt with full instructions. If there were any advantage to his principal in giving his own note to Juneau for the purchase money, he should have refused his assent to the change, permitting Fithian to become paymaster. It does not appear that Murphy's claim on Juneau on the bond has been endangered, or become less secure; and as to the amount he would be entitled to receive,

McDonald *v.* Fithian *et al.*

it was not Fithian's business to adjust.  Whether he should befriend Juneau by keeping his secret, or Murphy by divulging it, was for himself to decide between friends.  These circumstances explain fully to me the motives of his silence, and refusal to explain the two sets of notes.   In all these circumstances, I can see no evidence of fraud, or bad faith, affecting the interest of the parties to this contract, in any matter confided to Fithian.  Whatever of contradiction there may have been in his account of the transaction, seem to me to have arisen from his anxiety to satisfy those who inquired without divulging this other fact.  A refusal to give an explanation which, when given, does not at all vary, or affect the rights of the parties, will surely not be a fraud.   It seems to me to be unfortunate for him, that he assumed an obligation of secrecy, that prevented him from answering the legitimate inquiries of those concerned; and it should be an admonition, from its consequences, of that truth, that open confession is good for the soul.

Decree affirmed with costs.*

*Decree affirmed.*

---

* Justices TREAT, SHIELDS, and THOMAS dissented from the foregoing Opinion.

J. J. BROWN, for the appellant, presented a petition for a re-hearing, which was denied.